ARTHUR STROUGH and Others, Comprising the Mayor and the Board of Trustees of the Village of Canastota, New York, and CARL WEIME and Others, Constituting the Water Commissioners of the Village of Canastota, New York, Plaintiffs, *v.* FRANK CONLEY, FRED CONLEY, AGNES CONLEY, WILLIAM RYAN and JAMES RYAN and BESSIE M. BUTTON, as Successors in Title of EDWIN BULL and SMITH CADY, of the Town of Sullivan, Madison County, New York; S. PERRY SMITH and ELLEN T. SMITH, of Morrisville, New York; ROMAIN D. BUTTON and EMMA F. BUTTON, of the Town of Sullivan, New York, Defendants.

Supreme Court, Madison County, September 2, 1937.

*George B. Russell* [*A. G. Waldo* of counsel], for the plaintiffs.

*Hopkins & Shapiro* [*P. Augustus Hopkins* of counsel], for the defendants Conley.

*Harold F. Lee*, for the defendants Ryan.

*William E. Lounsbury*, for the Federal Land Bank of Springfield, interpleading.

*Merchant B. Hall*, for the defendants Button, not appearing on the issue of damages.

McNAUGHT, J.   In the year 1886, in connection with the establishment of a municipally-owned water supply for the village of Canastota, the plaintiff acquired certain springs by conveyance from one Romain D. Button.   The springs are located on what was known as the spring lot, and all flowed in a westerly or northwesterly direction to a point where they united to form a stream which flowed westerly through the premises of Bull, Cady and Smith, predecessors in title of the defendants Conley and Ryan, and emptied into Canaseraga creek.   Whether one of said streams flowing from such springs originally flowed easterly or westerly was disputed before the official referee.   He held that they all flowed in a westerly direction.

The springs and streams therefrom so acquired were to be diverted, the flow therefrom collected and conveyed in an easterly direction to be discharged into Canastota creek, and thence into the main reservoir supplying water to the village of Canastota.

The lower riparian owners, Bull, Cady and Smith, objecting to the diversion of the waters and commencing, or threatening to commence legal proceedings, by deed dated the 16th day of August, 1887, the village of Canastota acquired from Romain D. Button and Emma F. Button, his wife, a parcel of land one rod square, indicated on a map annexed to the deed, to be used as a reservoir for storage of water, " together with the right to lay, relay, and maintain water pipes to conduct water therefrom, to the residences of Edwin Bull and others, and also to conduct the waters from said Reservoir across said Button's land, to the Canastota Creek."

Prior to the acquisition of the reservoir site, by an instrument dated the 5th day of August, 1887, Edwin Bull, Smith Cady, S. Perry Smith and Ellen T. Smith, his wife, conveyed to the plaintiff " all their right title and interest, in and to the waters from the springs and creeks upon the lands of Romain D. Button, in the Town of Sullivan aforesaid, indicated and shown upon the annexed map, * * * the same to be forever, or so long as second party may desire, diverted at the point marked ' Reservoir ' on said map, and conducted by said second party to the Canastota Creek and reservoir for the use of the Canastota Water Works, except so much of said waters as are hereinafter specified."   The village of Canastota, the party of the second part to such instrument, in consideration of such transfer, and in full settlement of all damages for such diversion, agreed " to construct and maintain a reservoir and pipes for conveying the water required by said first parties for the use of their respective farms in watering stock kept thereon, and for domestic use, and also for lawn sprinkling and washing

wagons at the residence of said Bull from Lawn Hydrant hereinafter specified, so long as said waters are diverted as aforesaid by said second party." The instrument then provided in considerable detail the size of pipe and points to which the same should be constructed for the purpose of furnishing water to the lower riparian owners. It was also provided, " second party is to have the right to lay said pipe across said farms of first parties, free of charge for damages, digging, &c." It was likewise provided: " The water supply at said several branch pipes shall be adequate and sufficient for the purposes above specified, so long as said water is diverted as aforesaid but in no case is said supply to exceed the natural supply of water from said springs and creeks." This instrument was recorded as a conveyance in the office of the clerk of the county of Madison, December 13, 1887, in liber 170 of Deeds at page 191.

Subsequently the village of Canastota constructed said reservoir, conducted the water from the various springs and streams specified to the same, diverted all flow therefrom to the west through the lands of the predecessors in title of the defendants Conley and Ryan, and also diverted the same to the east emptying into Canastota creek. A system of piping was installed leading from the reservoir or spring house across the lands of Button and onto and through the lands of the predecessors in title of the defendants Conley and Ryan. It is claimed the pipes and connections were not installed as provided by the agreement; that the plaintiff failed to keep and maintain the same in a proper and workable condition, and that by reason of the failure of the plaintiff to meet the obligations resting upon it under the agreement, the defendants Conley and Ryan suffered substantial damages in that the supply of water was not adequate or sufficient, nor did they receive that flow to which they were entitled under the agreement. They seek to recover such damages in this action.

The water from the springs and streams in question contained a high lime content. Some time prior to July 15, 1932, questions arose relative to the quality of the water, and it was determined to discontinue the service from the municipally-owned plant and acquire a supply for the village of Canastota from the system maintained and operated by the city of Oneida. On July 15, 1932, service of Oneida city water commenced in the village of Canastota, and the plaintiff ceased to use the water from its previously owned municipal system, including the waters from the springs and streams in question.

For a period of several years prior to the acquisition of the Oneida city water by the plaintiff, and subsequent thereto, the

defendants made vigorous complaint to the water superintendent and the board of water commissioners of the plaintiff, relative to the condition of the system supplying them, and the plaintiff did some work and expended some funds in connection with correcting, or attempting to correct, the conditions of which defendants complained. The plaintiff, in the summer of 1932, notified the defendants that it had abandoned and ceased to use the water from the springs in question. Subsequently this action was brought, the summons and complaint being served on the 24th day of September, 1932. Answers were served by the defendants and a reply by the plaintiff.

By the decision of the official referee, affirmed by the Appellate Division (*Strough* v. *Conley*, 251 App. Div. 487), it has been determined that there has been a practical location concurred in for more than forty years as to the lands and rights conveyed, and that the plaintiff cannot now divert the waters and return them to the original channel.

The plaintiff contends that under the instrument of August 5, 1887, it has the right to terminate its use of said waters, being vested with a discretionary privilege by the language of such instrument to the effect that the same was to continue " forever, **or so** long as second party may desire."

The fact the plaintiff has ceased to use the waters so diverted, and has in fact abandoned the same, cannot relieve it, and does not relieve it from the performance of its obligations to the defendants so long as the diversion continues, whether by act of the plaintiff, or by reason of the adjudication of the court that it cannot return the waters it has diverted to the original channel under the facts and circumstances existing in the case. The obligation to perform its covenants under the agreement of August 5, 1887, continues until such time as the lower riparian owners can be or are restored to the condition existing at the time the diversion occurred.

The plaintiff contends that the defendants cannot recover upon their counterclaim, for the reason that no claim was presented to the plaintiff within the time provided by sections 341 and 341-b of the Village Law. This question was clearly presented to the court upon a motion for that specific reason to dismiss the counterclaims interposed. The motion was heard at a Trial and Special Term in the county of Madison, by Mr. Justice HEATH, and by a decision dated February 25, 1933, the motion was denied. An order denying such motion was duly entered in Madison county clerk's office. There has been no appeal therefrom. The determination upon the motion is *res judicata* in this case.

The plaintiff contends that the instrument of August 5, 1887, was personal to the parties of the first part thereto, the predecessors in title of the defendants Conley and Ryan; that the instrument does not provide that the covenants run with the land or its provisions apply to the heirs, representatives and assigns of the first parties, and the defendants Conley and Ryan can assert no rights thereunder as against the plaintiff. While the instrument has been referred to by various terms, as an " instrument," an " agreement," and a " contract," it was to all intents and purposes a conveyance. It was treated as a conveyance by the parties. By its terms it conveyed rights and interest in land. It was clearly a conveyance. (Real Prop. Law, § 240, subd. 2; § 290, subd. 3.) By its terms it conveyed water rights and it granted easements. It was clearly intended to be not only for the personal benefit of the first parties as owners who executed it, but as an appurtenance of the farms they then owned. Clearly the parties could not have surrendered the rights and granted the privileges expressed in the instrument with the idea or intention that all rights thereunder should cease so far as their properties were concerned should they die or convey.

It is well established that a conveyance must be construed so as to give effect to the intent of the parties manifested by the language used, and where more than one construction is susceptible the courts will look to the surrounding circumstances existing when the contract was entered into, the situation of the parties, and the subject-matter of the instrument. (*Blackman* v. *Striker*, 142 N. Y. 555, 563; *Wilson* v. *Ford*, 209 id. 186; *Fleischman* v. *Furgueson*, 223 id. 235, 239.)

The instrument did not convey an easement in gross. Everything essential to the beneficial use of the property conveyed, unless specially excepted, is to be considered as passing by the conveyance. (*Huttemeier* v. *Albro*, 18 N. Y. 48; *Voorhees* v. *Burchard*, 55 id. 98; *Winchester* v. *Osborne*, 61 id. 555; *Spencer* v. *Kilmer*, 151 id. 390, 399; *Mattes* v. *Frankel*, 157 id. 603.)

It is a general rule that upon the conveyance of property the law implies a grant of all the incidents rightfully belonging to it at the time of conveyance and which are essential to the full and perfect enjoyment of the property. (18 C. J. 294, § 272.)

" As used with reference to real property, the word ' appurtenance ' has a well-defined meaning; and is not ambiguous so as to require explanation. It has been said that the term is ordinarily confined to incorporeal rights, such as easements and servitudes; that it means and includes all rights and interests in other property necessary for the full enjoyment of the property conveyed; and it

has been specifically defined as meaning that which might become necessarily connected with the full and free use and enjoyment of the particular premises." (6 C. J. Supp. 136.)

The rights of the first parties under the agreement of August 5, 1887, became and were appurtenances of the property owned by them, and as such passed by conveyance from their predecessors in title to the defendants Conley and Ryan. (*Spencer* v. *Kilmer, supra; Wilson* v. *Ford, supra; Evangelical Lutheran Church* v. *Sahlem,* 254 N. Y. 161; *Atlantic Mills of Rhode Island* v. *N. Y. C. R. R. Co.,* 221 App. Div. 386.)

We, therefore, conclude that all rights vested in the predecessors in title of the defendants Conley and Ryan ran with the land, became an appurtenance thereof, passed by mesne conveyances, and are now vested in such defendants.

It has been determined in this action that the plaintiff cannot now divert the water from the springs and streams on the Button lands as it now flows, by restoring the same to its original channel. Unless the waters were restored to their original channel, the same conditions exist as have existed for fifty years as to the lower riparian owners. The plaintiff cannot avoid its obligations by simply saying " We will abandon." It is obligated, so long as the waters are diverted as they have been for the past half century, to perform its covenants and agreements in relation to such diversion. It is consequently obligated to furnish water to the premises owned by the defendants Conley and Ryan at the time of the commencement of the action, that being their only source of supply because of the diversion of the waters by the plaintiff. We are, therefore, of the opinion that the system supplying the former Bull, Smith and Cady properties must be continued and maintained by the plaintiff. This being true, it necessarily follows that the defendants Conley and Ryan are entitled to recover such damages as they may have sustained by reason of the failure of the plaintiff to maintain the system furnishing water to their premises in a proper condition.

The plaintiff urges that many more so-called outlets have been installed than were specified in the instrument of August 5, 1887, basing the contention on the number of taps taking water from the supply pipes. The lower riparian owners were entitled to " the water required  *  *  *  for the use of their respective farms in watering stock kept thereon, and for domestic use." The water was to be supplied from the flow through the specified pipes. The provisions cannot be reasonably construed as preventing the installation of water buckets in the barn for dairy use or the use of sink, lavatory, toilet or bath in the house.

Defendants contend the plaintiff was obligated to furnish water at *any* place on the farms the owners might designate. Such an interpretation of the agreement is unjustified.

The manner in which the pipe was installed, the sizes of pipe, the care and attention which was given to it, the fact that the pipes became almost entirely incrusted at some points due to the lime content of the water, the failure of the plaintiff to replace the same, the inability to secure water upon the premises at necessary points, the fact that water was not available at various places and at times was very meagre in quantity, the failure of the defendants to use reasonable prudence in the use of water and prevent waste, were all matters that were seriously controverted and in relation to which the testimony is contradictory. Upon all of the testimony we are of the opinion it is fairly established the plaintiff has not given that reasonable care to the maintenance of the piping system that it should have given in order to meet its obligations. We do not deem it necessary to enter into a discussion of the minute details relative to the maintenance of the system. Upon all of the evidence, and under the principles of law hereinbefore stated, we are of the opinion the defendants are entitled to recover damages.

Preliminary to a consideration of the amount of damages, it is necessary to determine a question raised upon the trial as to whether or not the defendants are limited to the recovery of damages up to the time of the commencement of the action, or whether damages may be recovered to the time of trial. The defendants are entitled to recover damages for the six years preceding the commencement of the action, and up to the date of trial. The same principle applies as in ejectment, nuisance and injunction. (*Beir* v. *Cooke,* 37 Hun, 38; *Vandevoort* v. *Gould,* 36 N. Y. 639; *Willis* v. *McKinnon,* 178 id. 451, 457; *Gallagher* v. *Kingston Water Co.,* 25 App. Div. 82; affd., 164 N. Y. 602.)

The damages must be definite and certain, and the amount cannot be based upon speculation, surmise or guess. The difficulty in applying the rule is particularly manifest in this case. The language of the Court of Appeals in *Wakeman* v. *Wheeler & Wilson Mfg. Co.* (101 N. Y. 205), at page 209, is particularly apposite in this case. "It is frequently difficult to apply the rules of damages and to determine how far and when opinion evidence may be received to prove the amount of damages; and the difficulty is encountered in a marked degree in this case. One who violates his contract with another is liable for all the direct and proximate damages which result from the violation. The damages must be not merely speculative, possible and imaginary, but they must

be reasonably certain, and such only as actually follow or may follow from the breach of the contract. They may be so remote as not to be directly traceable to the breach, or they may be the result of other intervening causes, and then they cannot be allowed. They are nearly always involved in some uncertainty and contingency; usually they are to be worked out in the future, and they can be determined only approximately upon reasonable conjectures and probable estimates. They may be so uncertain, contingent and imaginary as to be incapable of adequate proof, and then they cannot be recovered because they cannot be proved. But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain."

Unliquidated damages recoverable for a breach of contract must be reasonable, certain and definite in amount, and not speculative, problematical or resting on conjecture. (*Witherbee* v. *Meyer*, 155 N. Y. 446; *Cramer* v. *Grand Rapids Show Case Co.*, 225 id. 63; *Broadway Photoplay Co.* v. *World Film Corp.*, 225 id. 104, 109; *Wooldridge* v. *Shea*, 186 App. Div. 705.)

The question of an allowance for permanent damages to the freehold by reason of being deprived of an adequate supply of water due to the failure of the plaintiff to observe its obligations under the agreement of August 5, 1887, or because of abandonment by the plaintiff, is not here involved.

The defendants Ryan have offered testimony to substantiate their counterclaim for the period from April, 1928, to March, 1933.

The testimony is to the effect that during this period the supply of water failed or was very meagre one-third of the time, that they were compelled to draw water either with a truck or team, and in the winter time upon sleighs, a distance of at least one-half mile. They seek to recover the reasonable value of the services of a man and truck or team at least one hour per day, a total of 610 hours. Their testimony is to the effect that such services were of the value of at least seventy-five cents per hour. It is also claimed that at times it was necessary to make more than one trip per day and that often the services of two men were necessary.

There was some testimony to the effect that at times the defendants Ryan were compelled to pump water at their barn during the summer months. There is also testimony to the effect that at certain times in the summer it was necessary for the defendants

Ryan to drive their dairy of cows a considerable distance to obtain water.

Some question is raised as to a loss in milk production from the dairy, due to the failure of an adequate supply, but there is no evidence to substantiate the claim.

Unquestionably the defendants Ryan did draw water, expend time and labor, and were caused expense by reason of the failure of the plaintiff to maintain the piping system in a proper condition. The fact such condition existed and such expense was incurred is fairly established by a preponderance of the evidence. It is impossible to reduce a computation of the damages to an arithmetical formula, but giving full consideration to all of the testimony, both on the part of the defendants Ryan and the plaintiff, we fix the amount of damages the defendants Ryan have sustained and are entitled to recover against the plaintiff upon their counterclaim at the sum of $350.

The testimony in support of the counterclaim of the defendants Conley is in substance to the effect that they were without water about one-third of the time for a period of six years prior to the commencement of the action, and up to February 14, 1933.

The proof submitted is to the effect that during the period in question they were compelled to draw water, carry water and drive their cattle a considerable distance, all of which caused an expenditure of labor and time and the incurring of expense. Cattle were driven from the so-called upper barn to the main barnyard; water was drawn with a team; water was carried for domestic purposes for about one-third of the time. It is sought to compute the damages at so much per hour, and so many hours per year, for various items.

It is fairly established by a preponderance of the evidence that the defendants Conley were obliged to draw water, carry water for domestic purposes, and were caused expense, time and labor, in so doing, owing to the failure of the plaintiff to maintain the piping system in proper condition.

Taking all of the testimony on the part of the defendants Conley and on the part of the plaintiff into consideration, we find that the amount of damages so incurred for which the defendants Conley are entitled to recover in this action upon their counterclaim is the sum of $1,000.

The principal item of damage claimed by the defendants Conley upon the counterclaim is for loss of revenue because of a decreased production from their dairy, due to insufficient water being available for such dairy because of the failure of the plaintiff to maintain the water system in a proper condition.

The testimony relative to this claim for damages is extensive. Experts have testified as to the effect upon a dairy of an insufficient supply of water. Elaborate charts have been presented in evidence showing the total number of pounds of milk produced per month over a period of twenty-nine months, the number of milch cows in the dairy each month, the average number of pounds of milk per cow per day which was produced during each of the months of such period, and the average number of pounds of milk produced per cow per year.

Charts and tables extend back to April, 1925, it being the contention that during the years 1925 and 1926 there was a reasonably adequate water supply. It is argued that the average production per cow during the years 1925 and 1926, when supplied with a fairly adequate amount of water, established a reasonable average number of pounds of milk which would be produced each year per cow.

Testimony was given relative to the method of building up the dairy and the feeding ration, and from the tables and charts so made up and the testimony of the experts, computation is made that over the period from 1927 to 1933 there was a loss in production from that which would have been produced if a normal, adequate and sufficient amount of water had been available, of many thousands of pounds of milk per year. Taking the average price per hundred pounds received during each of the years, the defendants Conley seek to recover as damages the amount the number of pounds of loss of production as so computed, multiplied by the average price per hundred pounds for the year would equal.

That a deficiency in the supply of water for a dairy of milch cows, or the necessity of driving a dairy of milch cows a considerable distance to water, will affect the production of milk, is undoubtedly a fact. It is also a fact that the nature of the season, the condition of pastures, the after feed, the weather, the temperature, and the care given to a dairy, will all, or any of them, affect the production of milk. It is equally true that the quality of the cows in the dairy and their condition of health will be reflected in the milk produced from such dairy.

The testimony in relation to this element of damage, aside from the actual amount of milk produced and the price received therefor, is almost entirely conjecture, surmise and conclusion. The proof is most highly speculative. It fails to establish any reasonable, certain, definite and well-founded determination as to loss of production. It is too unstable, uncertain and conjectural to base an allowance of damages upon it.

There is, however, another substantial obstacle to the allowance of the claim made. The defendants Conley seek to recover as

damages the alleged loss of production based upon the average price per hundred pounds during each year. They seek to recover the entire amount which it is claimed under the method of figuring used, would have been received by them for milk produced from the dairy. Such sum, if computed, could not by any stretch of imagination be fixed as the loss they had incurred. It would be necessary to take into consideration and determine what the cost of production of such milk would have been, what feed it would have been necessary to have purchased, what time it would have been necessary to expend. The cost of feed, the value of pasturage, the expense of labor, the cost of delivery, would all have to be deducted for the reason that the only actual loss that could have been sustained would be the loss of the profits which would have been realized upon the quantity of milk which it is claimed would have been produced had an adequate supply of water been furnished.

Damages must be not merely speculative, possible and imaginary; they must be reasonably certain. They may not be so remote as not to be directly traceable to the breach, and they must not be the result of other intervening causes. (*Wakeman* v. *Wheeler & Wilson Mfg. Co., supra,* 209.)

The damages sought to be recovered by the defendants Conley for loss of production of milk are not certain and definite. They are speculative, conjectural, problematical and uncertain. The facts established upon this phase of the counterclaim are insufficient to warrant the allowance of damages in any amount.

The motion of the plaintiff to dismiss the counterclaims of the defendants Conley and the defendants Ryan, as enumerated in the written notice of said motion filed with Official Referee SENN, December 10, 1936, being made as of the time the evidence was closed, has been considered and is hereby denied.

Proposed findings of fact and conclusions of law not having been presented prior to the determination of the issues, findings of fact and conclusions of law will be made only in accordance with the views herein expressed.

Submit findings and judgment in accordance with the foregoing decision.

Separate bills of costs are awarded to the defendants Conley and the defendants Ryan, the same to be taxed by the clerk of the county of Madison.